IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    :    No.  4:06-CR-341
    :
      Plaintiff,    :    (Judge Jones)
    :
      v.    :
    :
DANE EARL ALBERTSON, SR.    :
    a/k/a EARL ALBERTSON,    :
    :
      Defendant.    :

**ORDER**

**March 14, 2007**

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Pending before this Court is a Motion to Suppress ("the Motion"), filed by

Defendant Dane Earl Albertson, Sr. ("Defendant" or "Albertson"), on January 9,

2007.  (Rec. Doc. 28).  For the reasons that follow, the Motion will be denied.

**PROCEDURAL HISTORY:**

On October 12, 2006, the Grand Jury for the Middle District of Pennsylvania

returned a two-count Indictment against Albertson.  (Rec. Doc. 1).  In Count One,

he was charged with Possession of Firearms and Ammunition by a Convicted

Felon, in violation of 18 U.S.C. § 922(g)(1), and in Count Two, he was charged

with Receiving or Possessing a Firearm which is Not Registered in the National

Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5861(d), 5841, 5845(e), and 5871. (Rec. Doc. 1). We note that Defendant was ordered detained on or about November 21, 2006 (doc. 22), and Defendant has pleaded not guilty to the charges (doc. 16).

On January 9, 2007, Defendant filed the instant Motion (doc. 28), which has been briefed by the parties. On February 2, 2007, this Court issued an Order canceling the scheduled hearing on the Motion after concluding that there were no genuine factual disputes warranting a hearing. (Rec. Doc. 34). Accordingly, the matter is ripe for our review.

**FACTUAL BACKGROUND:**

For our purposes here, we accept the following facts from Defendant's Motion, and the Exhibits attached thereto, as true. (See Rec. Doc. 28).

On July 14, 2003, in the Court of Common Pleas of Columbia County, Albertson was sentenced to 11 ½ to 23 months of imprisonment in the Columbia County Prison on a charge of carrying a firearm without a license. (Rec. Doc. 28, ¶ 9). Also on July 14, 2003, in the aforesaid court, Albertson was sentenced to 24 months of probation, to run consecutive to the sentence imposed on the firearms charge, on a charge of reckless endangerment. (Rec. Doc. 28, ¶ 10). Both of these sentences were imposed under docket number 726 of 2001 ("No. 726") in the

Court of Common Pleas of Columbia County.

On December 22, 2003, Albertson was paroled on No. 726.  (Rec. Doc. 28, ¶ 11).  However, on April 29, 2004, Albertson's parole was revoked and he was resentenced to incarceration until his maximum date of December 7, 2004.  (Rec. Doc. 28, ¶ 12).

On December 7, 2004, Albertson was released from the Columbia County Prison.  (Rec. Doc. 28, ¶ 13).  Albertson alleges that at the time of his release, he was told by prison staff that his sentence had been completed.  (Rec. Doc. 28, ¶ 14).  Thus, Albertson did not report to the Columbia County Adult Probation Office ("Probation Office") upon his release, and no contact between Albertson and the Probation Office occurred for approximately nine (9) months, from December 7, 2004 until September 18, 2005.  (Rec. Doc. 28, ¶¶ 15-16).

A couple of days prior to September 18, 2005, the Chief of the Columbia County Adult Probation and Parole Office, Donald Coleman ("Chief Probation Officer Coleman"), conversed with Pennsylvania Board of Probation and Parole Agent Ron Hess ("Agent Hess"), who conveyed some suspicions about Albertson. (Rec. Doc. 28, ¶¶ 16, 18).  Agent Hess conveyed to Chief Probation Officer Coleman the following: The Pennsylvania State Police ("PSP") suspected that Albertson had ties to Damien Cox ("Cox") and that Cox was frequenting

3

Albertson's house.  (Rec. Doc. 28, ¶ 24).  Cox was being supervised by the Pennsylvania Board of Probation and Parole (doc. 28, ¶ 20), and warrants had been issued for Cox's arrest because he was suspected of committing multiple burglaries (doc. 28, ¶ 23).

On September 16, 2005, the Probation Office sought and received a bench warrant for Albertson.  (Rec. Doc. 28, ¶ 19).  On September 18, 2005, probation officers from Columbia County, parole agents from the state parole board, and state troopers arrived at Albertson's residence.  (Rec. Doc. 28, ¶ 27).  Albertson was taken into custody as a result of the bench warrant, and Chief Probation Officer Coleman directed that Albertson's house be searched.  (Rec. Doc. 28, ¶¶ 28-29).

Chief Probation Officer Coleman directed the search because he believed that he had reasonable suspicion that Albertson was in violation of several conditions of probation.  (Rec. Doc. 28, ¶ 33).  Specifically, Chief Probation Officer Coleman testified that he knew that Albertson "was failing to make any contact with his officer, intensive supervision officer," and that he suspected that Albertson was "in contact with another person on probation or parole" and that Albertson possessed "firearms or illegal narcotics in the residence at that time." (Rec. Doc. 28, ¶ 35).

As a result of Chief Probation Officer Coleman's instruction, the probation officers and police officers present searched Albertson's house "to check for violations of his probation." (Rec. Doc. 28, ¶ 30; Exh. E at 3). The search revealed tools that matched a description of tools that had been reported stolen in the recent burglaries, including a Dewalt radio/charger and a Dewalt air compressor. (Rec. Doc. 28, ¶ 36). The search also revealed firearms, including a muzzleloader and several pieces of a shotgun. (Rec. Doc. 28, ¶ 38). Rather than seizing any of these items, the PSP photographed them. (Rec. Doc. 28, ¶¶ 37, 39, 40).

Using the information gained during the initial search on September 18, 2005, on October 28, 2005, the PSP submitted an Affidavit of Probable Cause in support of an Application for Search Warrant to search Albertson's residence for the following: Husqvarna chain saw; Craftsman 10" mitre saw; Campbell/Hausselb air compressor, impact wrench, and nailer; and other tools and items believed to have been stolen. (Rec. Doc. 28, ¶¶ 43-44). On said date, the PSP received the requested search warrant, and pursuant thereto, searched Albertson's residence. (Rec. Doc. 28, ¶ 45). However, rather than seizing any of the tools listed on the search warrant, they seized two small containers containing what was "believed to be illegal drugs." (Rec. Doc. 28, ¶ 45).

Also using information obtained during the initial search on September 18,

5

2005, on November 9, 2005, the PSP obtained a second search warrant for

Albertson's residence.  This search warrant enabled officers to look for sawed-off

shotguns, Mossberg shotguns, SKS style rifles, .357 caliber handguns, a black

Sheriff's duffel bag, ammunition, and any firearms, including, but not limited to,

rifles, handguns, and shotguns.  (Rec. Doc. 28, ¶ 46).  During the resulting search

on same date, the PSP seized a Stevens Model 67L shotgun barrel and receiver, a

shotgun stock, a shotgun pump action, various types of ammunition, and a yellow

box containing documents.

## DISCUSSION:

Defendant moves this Court to enter an order suppressing all physical

evidence seized from his residence.  (Rec. Doc. 28 at 14).  First, Defendant argues

that his Fourth Amendment rights were violated when, on September 18, 2005, his

residence was searched prior to his "official installation" on probation, and without

reasonable suspicion.  (Rec. Doc. 28 at 12-13).  Second, Defendant argues that

because both subsequent search warrants were obtained based on information

obtained during the September 18, 2005 search, all evidence obtained pursuant

thereto is fruit of the original, allegedly unconstituional search and, thus, must also

be suppressed.  (Rec. Doc. 28, ¶ 56).  Finally, Defendant argues that at a minimum,

all of the documents in a yellow box that was seized at his residence on November

9, 2005, should be suppressed because the search warrant did not specify the search for or seizure of such documents.

In response, the Government asserts that none of the physical evidence obtained in any of the searches of Defendant's residence should be suppressed, and it addresses each of Defendant's arguments in turn.  First, the Government argues that the September 18, 2005 search was valid because, on said date, Defendant was on probation and reasonable suspicion existed.  (Rec. Doc. 33 at 2-4).  Second, the Government argues that because the September 18, 2005 search was valid, no evidence obtained in the subsequent searches is fruit of an unconstitutional search, and, hence, should not be suppressed.  (Rec. Doc. 33 at 3).  In the alternative, the Government argues that even if the information in the November 9, 2005 Application for the Second Search Warrant were excised, probable cause to support the issuance of the second search warrant still existed. (Rec. Doc. 33 at 4-5).  Thus, the Government argues that at a minimum, the evidence obtained during the November 9, 2005 search should not be suppressed.

We initially note that the governing jurisprudence of the Fourth Amendment to the United States Constitution is the logical starting point in our analysis of Defendant's Suppression Motion.  The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and

effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. CONST. amend IV.

However, as the Supreme Court held in Griffin v. Wisconsin, 483 U.S. 868 (1987), and reiterated in United States v. Knights, 534 U.S. 112 (2001), "a State's operation of its probation system present[s] a 'special need' for the 'exercise of supervision to assure that probation restrictions are in fact observed.'"  534 U.S. at 117 (internal brackets omitted).  Thus, "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens."  Id. at 119.  Notably, probation conditions can diminish a probationer's reasonable expectation of privacy under the Fourth Amendment.  See id. at 120.

Indeed, Knights held that a search can be conducted if an officer has reasonable suspicion that the probationer is engaged in criminal activity.  See id. at 121.  No warrant or probable cause is necessary.  Id.  Accordingly, Pennsylvania has fashioned its law governing the search of probationers' property: "[a] property search may be conducted by any [county probation] officer if there is reasonable

8

suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision."  61 P.S. § 331.27b(d)(2).  The only additional requirement is that "[p]rior approval of a supervisor shall be obtained for a property search absent exigent circumstances."  61 P.S. § 331.27b(d)(3).

In the instant action, Defendant's Exhibits amply demonstrate that Albertson was on probation from December 7, 2004 until December 7, 2006.  (Rec. Doc. 28, Exhs. B-C).  We so find because the Exhibits, as well as  Defendant's Motion, make clear the circumstances surrounding Albertson's punishment for his state convictions.  On July 14, 2003, he was sentenced to 11 ½ months to 23 months of incarceration for carrying a firearm without a license (doc. 28, Exh. B), and to 24 months of probation, to run consecutive to the aforesaid imprisonment term, for reckless endangerment (doc. 28, Exh. C).  Although Albertson was paroled on December 22, 2003 (doc. 28, ¶ 11), his parole was revoked on April 29, 2004, because he was found "to be in violation of his intensive supervision parole" (doc. 28, Exh. D).  Thus, he was resentenced to incarceration until his maximum date of December 7, 2004.  (Rec. Doc. 28, Exh. D).  Upon Albertson's release on December 7, 2004, then, the 24 month term of probation began.

Albertson admits that he failed to report to the Probation Office following his

release on December 7, 2004.  (Rec. Doc. 28, ¶ 15).  He attributes his failure to

report to the Columbia County Prison staff, who allegedly told him that his

sentence was complete.  (Rec. Doc. 28, ¶ 14).  Albertson then argues that because

he had not signed any documents concerning the terms and conditions of

probation, "as of September 18, 2005, Albertson had not been officially placed on

probation or advised of any conditions of probation."  (Rec. Doc. 28, ¶ 32).

We find Albertson's argument, that he was not "officially" on probation as

of September 18, 2005, unavailing.  We so conclude because this Court is

intimately familiar with Pennsylvania's probation system. Defendant is interposing

an argument that assumes he must sign some type of receipt to be "officially" on

probation. We suspect he knows better.  In this case, Defendant was clearly

informed, both in open court and by a written order of the Court of Common Pleas

of Columbia County that issued on July 14, 2003, that his 24 month term of

probation would begin upon his release from the incarceration term to which he

was also sentenced that day.  Because of his own parole violation, Defendant was

not released from that prison term until his maximum date of December 7, 2004,

and, consequently, his probation term commenced on said date.

Moreover, Defendant's violation of parole and resulting re-incarceration

render unpersuasive Defendant's argument that he was not familiar with the terms

and conditions surrounding probation and parole.  Defendant would have been

apprised thereof at the time of his parole, and, indeed, his violation of such terms

and conditions provided practical experience with the application thereof.  As a

result, the contention that Defendant was unfamiliar with Pennsylvania's probation

system and his responsibilities thereunder is again simply not credible.

Having concluded that Defendant was on probation at the time his residence

was searched on September 18, 2005, we turn to consideration of whether the

probation officers that conducted the search had reasonable suspicion to do so.[1]

As Albertson accurately notes, in determining whether reasonable suspicion exists,

courts "consider the totality of the circumstances to determine whether the 'officer

has a particularized and objective basis for suspecting legal wrongdoing.'" United

States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005) (quoting United States v.

Arvizu, 534 U.S. 266 (2002)).  The Pennsylvania statute governing probation

officers' searches also outlines eight different factors that may be taken into

account.  See 61 P.S. § 331.27b(d)(6).  Those relevant to our determination

include: "[i]nformation provided by others," "[t]he activities of the offender," "[t]he

experience of the officers with the offender," "[t]he prior criminal and supervisory

---

[1] Defendant concedes that Chief Probation Officer Coleman directed the search of Albertson's residence (doc. 28, ¶ 29), and, thus, this requirement is satisfied.

history of the offender."

Consideration of 61 P.S. § 331.27b(d)(6)'s factors leads us to conclude that the Probation Office had both "a particularized and objective basis for suspecting legal wrongdoing," Williams, 417 F.3d at 376, and a reasonable suspicion that Defendant's residence would contain contraband or other evidence of violations of the conditions of supervision, 61 P.S. § 331.27b(d)(2).  First, the record demonstrates that talks with Agent Hess had revealed the PSP's suspicions, and, thus, caused the Probation Office to suspect, that Defendant was allowing Cox, a fellow parolee and/or probationer for whom arrest warrants had been issued because of his suspected involvement in burglaries, to frequent Defendant's residence.  Second, the Probation Office also knew that Defendant had violated his earlier parole; that Defendant had failed to report to the Probation Office following his release from prison more than nine (9) months earlier; and that Defendant had been convicted of carrying a firearm without a license and reckless endangerment. For all of these reasons, Chief Probation Officer Coleman had more than reasonable suspicion that a search of Defendant's residence would reveal contraband and evidence of probation violations.  In fact, by the time the initial entry and search took place, bells were ringing and red lights were flashing relating to a high probability that Defendant was reverting to his former criminal ways.

12

Because of our conclusion that Defendant was on probation at the time of the search of his residence on September 18, 2005, and that the Columbia County Probation Office had reasonable suspicion that Defendant's residence would contain contraband or other evidence of violations of the conditions of supervision, we hold that the search thereof did not violate the Fourth Amendment. Accordingly, we will deny Defendant's Motion to Suppress any evidence obtained therein.

Our holding that the September 18, 2005 search was constitutional necessarily renders moot Defendant's argument that the evidence seized pursuant to two search warrants that were obtained using information garnered in the September search was fruit of the poisonous tree.  (Rec. Doc. 29 at 10). Accordingly, we will also deny Defendant's Motion to Suppress all evidence seized pursuant to the search warrants.

Finally, we consider Defendant's argument that the seizure of the yellow box of documents during the execution of the November 9, 2005 search warrant was unconstitutional because the documents were outside of the warrant's scope. (Rec. Doc. 29 at 12-13).

We conclude that Defendant's argument for suppression of the yellow box of documents fails.  When police searched Defendant's home on November 9,

13

2005, they did so pursuant to a warrant that permitted them to search for and seize, inter alia, handguns and ammunition.  (Rec. Doc. 28, Exh. G at 1).  As it relates to the instant discussion, when they executed the warrant, they seized a yellow box containing documents.  (Rec. Doc. 28, Exh. G at 4-5).  Given that either handguns or ammunition could have been found in said box, certainly the officers acted within the scope of the warrant when opening it.  Indeed, another yellow box was seized because it contained ammunition.

The reality of the circumstances in which these officers found themselves upon opening the yellow box at issue here is that they saw documents that may incriminate Defendant.  That the officers seized the documents rather than undertaking a precise, on the spot analysis to reach a legal conclusion as to whether the documents were incriminating was their only reasonable course of action. Accepting Defendant's argument as true for the moment as to the non-incriminating nature of the documents, that will be a determination left for the finder of fact in the underlying criminal case. It is not a basis to suppress.

Here, Defendant found himself in a vulnerable position as a result of his own actions: first, his criminal acts that led to his July 14, 2003 sentences, and second, his wanton failure to report to the Probation Office as explicitly required by at least one of those sentences.  Despite this context, he now seeks to have this Court

essentially require that a police officer, acting upon a valid search warrant for ammunition and weapons at the home of a probationer, who finds a box that could contain either be required to 1) turn a blind eye to documents contained therein or 2) make an on-site determination as to their incrimination value.  We decline to interpose such a protocol.  Accordingly, we will deny Defendant's Motion to Suppress the documents contained in the yellow box.

**NOW, THEREFORE, IT IS ORDERED THAT:**

      1.     Defendant's Motion to Suppress (doc. 28) is **DENIED**.

<u>s/ John E. Jones III</u>
John E. Jones III
United States District Judge